UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

LOI NGO,

    Plaintiff,

v.

UNITED AIRLINES, INC., et al.,

    Defendants.

Case No. 19-cv-04277-JCS

**ORDER GRANTING MOTION TO REMAND AND VACATING NOVEMBER 22, 2019 HEARING AND INITIAL CASE MANAGEMENT CONFERENCE**

Re: Dkt. No. 14

## I. INTRODUCTION

Plaintiff Loi Ngo asserts state law claims, including claims of discrimination and harassment under the California Fair Employment and Housing Act ("FEHA"), against his former employer, United Airlines ("United"), and two of his former supervisors, Mohammed Buksh and Yvonne Pierce. He filed this action in the Superior Court of the State of California, County of Alameda and Defendants removed to federal court on the basis of diversity jurisdiction under 28 U.S.C. § 1332(a)(1). Although Defendants Buksh and Pierce are citizens of California – as is Ngo – Defendants contend there is diversity of citizenship because Buksh and Pierce were fraudulently joined in this action. Presently before the Court is Ngo's Motion to Remand ("Motion"), in which he argues that this action should be remanded to state court on the basis that there is no federal subject matter jurisdiction because neither Pierce nor Buksh is a "sham defendant" and therefore there is no diversity jurisdiction. The Court finds that the Motion is suitable for determination without oral argument and therefore **vacates the motion hearing set for November 22, 2019** pursuant to Civil Local Rule 7-1(b). Because the Court finds that this case must be remanded to state court, **the Initial Case Management Conference set for the same date is also vacated**.

For the reasons stated below, the Court GRANTS the Motion.[1]

## II. ALLEGATIONS IN THE FIRST AMENDED COMPLAINT[2]

Ngo alleges that he was employed by United for nearly 29 years when he was fired on March 2, 2018 during a medical leave of absence. FAC ¶ 16. Ngo worked on maintaining aircraft components at United's San Francisco International Airport ("SFO") maintenance base. *Id*. In recent years, he worked as a sheet metal technician, fabricating, repairing and overhauling sheet metal parts. *Id*. Defendant Buksh is currently a Senior Manager in the United's Components Shop at SFO and was a skip-level supervisor of Ngo. FAC ¶ 12. Defendant Pierce is a supervisor working under Buksh; she was Plaintiff's direct supervisor. FAC ¶ 13.

Ngo alleges in the FAC that Buksh and Pierce demonstrated hostility toward Ngo's disability-related physical restrictions from the time he first transferred to their unit. In particular, Ngo alleges that when Pierce learned Ngo was being transferred to her unit, she made it clear she did not want him because he had a 40-pound lifting restriction due to a prior industrial accident at United, telling Human Resources that she only wanted "100% workers." FAC ¶ 41. Likewise, Buksh allegedly tried to persuade Ngo to find a doctor who would be willing to support clearing the 40-pound lifting restriction from the file so that Ngo would appear to be 100% healed, even though Buksh knew that he was not. *Id*.

Ngo alleges that after he was transferred to Pierce and Buksh's unit he was injured twice – once in April 2016, when he injured his thumb ("the thumb injury") and next in May 2016, when

---

[1] The parties have consented to the jurisdiction of the undersigned magistrate judge pursuant to 28 U.S.C. § 636(c).

[2] Defendants refer to the original complaint in this action as the "Operative Complaint" throughout their Opposition brief, citing the fact that the First Amended Complaint ("FAC") was not served on them. As discussed below, the test for determining whether a defendant has been fraudulently joined for the purposes of federal jurisdiction is whether "there is a *possibility* that a state court would find that the complaint states a cause of action against any of the resident defendants." *Grancare, LLC v. Thrower by & through Mills*, 889 F.3d 543, 548 (9th Cir. 2018) (internal quotation and citation omitted) (emphasis in original). Thus, in determining whether remand is appropriate, the district court must consider not only the allegations in the operative complaint but also "whether a deficiency in the complaint can possibly be cured by granting the plaintiff leave to amend." *Id*. at 550. Here, the allegations in Ngo's FAC shed the most light on that question – regardless of whether the original complaint or the FAC is the "operative complaint" – and therefore the Court looks to that pleading rather than the original complaint in determining whether remand is appropriate under *Grancare*.

2

he injured his elbow ("the elbow injury"). FAC ¶¶ 17, 22. He alleges that after the thumb injury he was cleared to return to work with a 15-pound lifting restriction and instructions to reduce the use of his right upper body at work. FAC ¶ 17. According to Ngo, Pierce did not abide by these restrictions, forcing him to rely on his left arm and upper body to operate a sanding machine that required the use of two hands, even though she knew Ngo was right-handed and that he was in pain, and refusing to allow him to take adequate breaks to alleviate the physical strain. FAC ¶ 19. Ngo alleges that Buksh supported Pierce's forcing him to "use the outdated sanding machine, while in pain, in defiance of his doctor-ordered work restrictions." FAC ¶ 20. Ngo further alleges that the elbow injury was "due to the stress of relying on [the] left side of his body while working on the sanding machine." FAC ¶ 22.

According to Ngo, Pierce and Buksh knew that United had a newer sanding machine that was designed to prevent injuries like the one he sustained but refused to allow him to use it. FAC ¶ 23. Similarly, although there was "plenty of work available that Ngo could do" in the sheet metal maintenance operation that would not have violated his doctor-ordered physical restrictions, "Buksh and Pierce intentionally refused to shift Ngo to work that would have accommodated his physical restrictions." FAC ¶ 21.

After the elbow injury, Ngo was "examined by doctors arranged by United and was ordered to undergo physical therapy." FAC ¶ 25. According to Ngo, Buksh and Pierce made it difficult for him to go to physical therapy, denying him time off to go to the clinic where United had arranged for him to receive physical therapy and consistently giving him the "run-around" with respect to getting approvals, with each of them telling Ngo he needed to obtain approval from the other. FAC ¶3 27, 32. Because of Pierce and Buksh's overt hostility to his requests for scheduling accommodations, Ngo alleges, he was able to go to physical therapy only once. FAC ¶ 33. In contrast, "[o]ther workers (not East Asian or not immigrants) who needed time off or scheduling accommodations for medical reasons were given permission to go to their medical appointments" and physical therapy. FAC ¶ 31.

Ngo further alleges that Pierce treated him worse than other workers in response to his request for time off for family medical reasons, referring to his son as "your retarded son" when he

3

requested to "take a little time off to care for his disabled son." FAC ¶¶ 29-30.

Ngo also alleges that Buksh and Pierce repeatedly asked him about the details of his medical conditions, even though all they were entitled to know were the post-injury work restrictions that had been approved by United. FAC ¶ 34. According to Ngo, Buksh once pressed Ngo to give him a copy of a medical form he was not entitled to see, and on another occasion searched his tool box for medical reports. FAC ¶¶ 35-36.

Ngo alleges that as a result of the hostile work environment created by Buksh and Pierce he developed depression and anxiety and was forced to take an unpaid medical leave of absence. FAC ¶ 40. He attempted to return to work on May 9, 2017, reporting to work with a doctor's note clearing him to return to work with the same physical restrictions as when he had return to work in May 2016, but Buksh and Pierce sent him home saying they needed to get approval from headquarters. FAC ¶¶ 45-46. According to Ngo, [t]heir conduct was a striking departure from normal practices and betrayed an animosity targeted at Ngo." FAC ¶ 46. Ngo was forced to continue his medical leave as a result of this rejection. FAC ¶ 47. He was once again cleared to return to work in August 2017. FAC ¶ 48. He contacted United Medical department at United Headquarters and was instructed to return report to work on August 10, 2017; he was told that if any questions arose local management should call United Medical. *Id*.

According to Ngo, problems did arise: when he returned to work on August 10, 2017 Pierce and another manager told him he "could not be there." FAC ¶ 50. When Ngo told the managers that he was cleared to return to work and that they should call United Medical, Pierce and the other manager refused to do so, instead attempting to confiscate Ngo's employee badge, to Ngo's "shock and embarrassment." FAC ¶ 51. At that point another manager intervened and told Pierce that Ngo was still an employee of United so long as he was on medical leave and that she could not confiscate the badge. *Id*. Ngo was "humiliated and traumatized" by this experience. *Id*. He alleges that he has "seen numerous employees go on medical leave and never has he seen or heard of anyone getting rejected in similar fashion when they attempted to report back to work." FAC ¶ 52. After this second attempt to return to work he extended his medical leave again. FAC ¶ 54.

4

United consistently approved Ngo's requests for medical leave. *Id*. He understood that it approved the requests based on doctors' notes from Kaiser. FAC ¶ 55. United also received medical reports about Ngo's physical and mental conditions in 2017 because Ngo had filed for Workers' Compensation. *Id*. Nonetheless, on August 23, 2017, August 28, 2017 and September 13, 2017, Buksh sent Ngo letters "accusing Ngo of failing to return to work" and "ordered him to report to SFO on short notice for investigation into why he failed to return to work and fact-finding into the basis for his absence from work." FAC ¶ 57. Ngo alleges that Buksh "falsely claimed that Ngo did not report back to work, did not communicate with United, and did not inform United of his need for additional time off." *Id*. In addition, Buksh threatened Ngo with disciplinary action and falsely claimed that Ngo's absences since August 10, 2017 had been unauthorized. *Id*.

According to Ngo, on September 1, 2017 he sent a request for reasonable accommodation signed by his doctor to United Medical asking to return to work on September 20, 2017 on a part-time schedule, returning to a full-time schedule by October 2, 2017. FAC ¶ 59. Ngo alleges that United did not respond to this request, but on September 6, 2017 Pleasanton police officers knocked at his door and informed Ngo that his employer had sent them to "check on him." FAC ¶ 61. Ngo was "upset and distressed that his employer would send the police to his house, and his distress was heightened by seeing that the police officers' visit frightened his children." *Id*. Ngo alleges that Buksh called the Pleasanton police to request a welfare check even though no one from United had attempted to reach his spouse, who is the emergency contact in his personnel file, and Buksh knew that Ngo was on medical leave. FAC ¶ 62. He alleges that his supervisors and the Human Resources Department at SFO also knew that he was in regular contact with United Medical at headquarters with respect to his medical leave and return-to-work date and that threatening disciplinary action and sending the police to his house was merely harassment. FAC ¶ 63.

On September 22, 2017 Ngo sent another request for medical accommodation, again signed by his doctor, because he had not gotten a response to the first letter. FAC ¶ 66. "Out of concern that United would continue to ignore [Ngo's] request to return to work, his doctor also

5

stated that in the event United did not respond to the request, Ngo should be considered temporarily unable to return to work, for medical reasons." *Id*. On the same day, Ngo called United Medical to verbally follow up on his request to return to work and was told United would follow up. *Id*. According to Ngo, though, United never responded to his request. Instead, on October 4, 2017 United Medical sent him two "vague boilerplate" letters asserting that his absence from work from September 20, 2017 onward was "not sufficiently supported" and requesting further information about ongoing treatment. FAC ¶68-69. The letters did not explain why the September 20, 2017 doctors' note was found insufficient and did not address Ngo's requests to return to work or the fact that he had been trying to return to work, requesting only a temporary part-time schedule as an accommodation. FAC ¶ 69.

Ngo alleges that he continued to attempt to return to work, sending a letter to United Medical on October 13, 2017 asking what he needed to return to work and recounting that when he attempted to return to work on August 10, 2017 Piece and another supervisor had rejected him and refused to contact United Medical. FAC ¶ 71. He received no response to that letter. FAC ¶ 72. He experienced anxiety and depression as a result of United's treatment of him and continued to send doctors' notes informing United of his need to extent his medical leave. FAC ¶¶ 73, 77.

In the meantime, United sent Ngo a letter stating that he was required to appear for a medical evaluation on December 5, 2017 and also stating that Ngo had agreed to this specific appointment in a telephone conversation even though Ngo had not arranged for any medical evaluation through United Medical. FAC ¶ 74. Ngo did not go because he was confused as to why he had to undergo a medical evaluation from United and why the letter claimed he had agreed to the evaluation. FAC ¶ 75.

On March 2, 2018, Ngo received a letter from Buksh informing him that he had been terminated on the basis that he "failed to medically support [his] absence and make contact with [his] Supervisor and/or Manager, over a period of several months." FAC ¶ 79. The termination letter further stated that Ngo's absence was unauthorized since September 20, 2017 and therefore, that he had been terminated under Article 10, Section C of the collective bargaining agreement between United and Ngo's union. *Id*. Ngo alleges that the reason given for his termination was

6

pretext as "his managers had been determined to block Ngo's return to work and had a longstanding desire to fire him due to bias against Ngo's actual or perceived disability, medical condition, his race, ethnicity, national origin and/or ancestry, and his opposition to their attempted invasion of privacy." FAC ¶ 81.

On the basis of these allegations, Ngo asserts the following claims in his FAC: 1) discrimination based on physical disability, mental disability and medical condition under FEHA, Cal. Gov't Code § 12940(a), asserted against United only; 2) harassment based on physical disability, mental disability and medical condition under the Fair Employment and Housing Act ("FEHA"), Cal. Gov't Code § 12940(a), asserted against United, Buksh and Pierce; 3) employment discrimination based on national origin, ancestry and race under FEHA, Cal. Gov't Code § 12949(a), asserted against United only; 4) failure to provide reasonable accommodation under Cal. Gov't Code § 12940(m), asserted against United only; 5) failure to engage in interactive process under Cal. Gov't Code § 12940(n), asserted against United only; 6) wrongful termination in violation of public policy under Cal. Gov't Code § 12940(n), asserted against United only; 7) invasion of privacy, asserted against United and Buksh; 8) intentional infliction of emotional distress ("IIED"), asserted against United, Buksh and Pierce; 9) negligent supervision and training, asserted against United; 10) California Private Attorney General ("PAGA") violations under California Labor Code § 2698 *et seq.*, asserted against United; 11) failure to provide records pertaining to employment under California Labor Code § 226, asserted against United; and 12) failure to provide personnel files under California Labor Code § 1198.5, asserted against United.

## III. ANALYSIS

### A. Legal Standards Governing Fraudulent Joinder

A defendant may remove a civil action filed in state court if the action could have been filed originally in federal court. 28 U.S.C. § 1441. A plaintiff may move to remand the case to the state court from which it was removed if the district court lacks jurisdiction or if there is a defect in the removal procedure. 28 U.S.C. § 1447(c). Federal subject matter jurisdiction under 28 U.S.C. § 1332(a)(1), based on diversity, requires complete diversity of citizenship and an amount

in controversy in excess of $75,000. "Complete diversity" means that "each plaintiff must be of a different citizenship from each defendant." *Grancare, LLC v. Thrower ex rel. Mills*, 889 F.3d 543, 548 (9th Cir. 2018) (citing *Caterpillar Inc. v. Lewis*, 519 U.S. 61, 68 (1996)). However, where a non-diverse defendant has been fraudulently joined, diversity jurisdiction may still exist where the plaintiff is a citizen of the same state as the "sham defendant." *Ritchey v. Upjohn Drug Co.*, 139 F.3d 1313, 1318 (9th Cir. 1998).

"There are two ways to establish fraudulent joinder: '(1) actual fraud in the pleading of jurisdictional facts, or (2) inability of the plaintiff to establish a cause of action against the non-diverse party in state court.'" *Id*. (quoting *Hunter v. Philip Morris USA*, 582 F.3d 1039, 1044 (9th Cir. 2009)). "Fraudulent joinder is established the second way if a defendant shows that an 'individual joined in the action cannot be liable on any theory.'" *Id*. (internal brackets omitted) (quoting *Ritchey v. Upjohn Drug Co.*, 139 F.3d at 1318). "But 'if there is a *possibility* that a state court would find that the complaint states a cause of action against any of the resident defendants, the federal court must find that the joinder was proper and remand the case to the state court.'" *Id*. (emphasis in original) (quoting *Hunter*, 582 F.3d at 1046).

"A defendant invoking federal court diversity jurisdiction on the basis of fraudulent joinder bears a 'heavy burden' since there is a 'general presumption against finding fraudulent joinder.'" *Id*. (internal brackets omitted) (quoting *Hunter*, 582 F.3d at 1046). "Fraudulent joinder must be proven by clear and convincing evidence." *Hamilton Materials Inc. v. Dow Chem. Corp.*, 494 F.3d 1203, 1206 (9th Cir. 2007) (citing *Pampillonia v. RJR Nabisco, Inc.*, 138 F.3d 459, 461 (2d Cir. 1998)). The Ninth Circuit has upheld findings of fraudulent joinder in cases "where a defendant presents extraordinarily strong evidence or arguments that a plaintiff could not possibly prevail on her claims against the allegedly fraudulently joined defendant." *Grancare*, 889 F.3d at 548. On the other hand, courts refuse to find fraudulent joiner "where a defendant raises a defense that requires a searching inquiry into the merits of the plaintiff's case, even if that defense, if successful, would prove fatal." *Id.* at 548–49 (citing *Hunter*, 582 F.3d at 1046). Additionally, "[i]f a defendant cannot withstand a Rule 12(b)(6) motion, the fraudulent inquiry does not end there." *Id*. at 550. "For example, the district court must consider . . . whether a deficiency in the

8

complaint can possibly be cured by granting the plaintiff leave to amend." *Id*. A court may find fraudulent joinder only if the claim against the non-diverse defendant is "wholly insubstantial and frivolous." *Id*. at 549.

### B. Whether Ngo's FEHA Harassment Claims Against Buksh and Pierce are Wholly Insubstantial and Frivolous

Ngo asserts claims for harassment under FEHA against Buksh and Pierce. As both Defendants are citizens of California, Ngo must demonstrate only that there is a *possibility* that a state court would find that one of these claims is adequately alleged. Ngo easily meets that standard. Because Ngo's FEHA claims against Buksh and Pierce are not wholly insubstantial and frivolous the Court need not address the IIED claims that Ngo asserts against his supervisors.

Under FEHA, a supervisor may be held individually liable for workplace harassment, while only an employer may be held liable for discriminatory employment actions. *Roby v. McKesson Corp.*, 47 Cal. 4th 686, 707 (2009), modified, (Feb. 10, 2010). "[D]iscrimination refers to bias in the exercise of official actions on behalf of the employer, and harassment refers to bias that is expressed or communicated through interpersonal relations in the workplace." *Id*. Harassment does not include "[c]ommonly necessary personnel management actions," such as reassignment, disciplinary warnings, and termination. *Id*. at 707–08 (internal quotations and citations omitted). These personnel management actions can, however, be evidence of harassment because "some official employment actions done in furtherance of a supervisor's managerial role can also have a secondary effect of communicating a hostile message." *Id*. at 709.

Thus, in *Roby*, the California Supreme Court reversed the decision of the Court of Appeal that a pattern of supervisorial conduct could not give rise to a claim of harassment under FEHA, finding instead that while "some actions that [Roby's supervisor] took with respect to Roby [were] best characterized as official employment actions rather than hostile social interactions in the workplace, . . . they may have contributed to the hostile message that [her supervisor] was expressing to Roby in other, more explicit ways." *Id*. These actions included the supervisor's "shunning of Roby during staff meetings," "belittling of Roby's job" and "reprimands of Roby in front of Roby's coworkers." *Id*.

9

Further, the California legislature has made clear that even "[a] single incident of harassing conduct is sufficient to create a triable issue regarding the existence of a hostile work environment if the harassing conduct has unreasonably interfered with the plaintiff's work performance or created an intimidating, hostile, or offensive working environment." Cal. Gov't Code section 12923(b) (effective January 1, 2019). Moreover, FEHA provides that "[h]arassment cases are rarely appropriate for disposition on summary judgment." Cal. Gov't Code section 12923(d). Thus, for example, in *Doe v. Wells Fargo Bank, N.A.*, the court found that the plaintiff's supervisor was not fraudulently joined where the plaintiff asserted a FEHA harassment claim against him based almost entirely on "commonly-necessary personnel-management actions – e.g., determining job or project assignments, provision of support, and meeting attendance decisions" but where the plaintiff also alleged that the supervisor had made an offensive comment to the plaintiff ("I have good news for you. You're gonna want to suck my dick"). No. CV 19-5586-GW-PLAX, 2019 WL 3942963, at *6 (C.D. Cal. Aug. 19, 2019). The court rejected the defendants' arguments that the plaintiff could not rely on supervisorial actions to support his FEHA claim and that the claim failed because he had alleged only a single comment that could be considered harassing, reasoning as follows:

> [W]hat Defendants fail to recognize is that even one instance of harassment can be sufficient. *See* Cal. Gov't Code § 12923(b). Moreover, personnel management actions can still constitute harassment to the extent the actions send a harassing message. *See Martinez v. Michaels*, No. CV 15-02104 MMM (Ex), 2015 WL 4337059, at *2, 7 (C.D. Cal. July 15, 2015) (holding that the plaintiff's managers' alleged failure to investigate matters involving employee racism directed at the plaintiff could support a finding that some of the managers' actions were not strictly personnel management decisions). As such, based on the alleged "suck" comment, and the fact that such claims are rarely determined as a matter of law, Defendants have not satisfied their burden of establishing that [the supervisor] is a fraudulent defendant.

*Id*.

Here, Ngo has alleged that his supervisors engaged in a pattern of hostile conduct. To be sure, many of their actions were official actions that are within the scope of their supervisorial role, such as determining whether he would be allowed schedule accommodations to attend physical therapy, determining whether Ngo had provided the paperwork necessary to return to

10

work or even whether he would be permitted to keep his badge. Nonetheless, the alleged pattern of treating Ngo less favorably than other employees based on national origin[3] and physical and mental disability or medical condition with respect to these supervisorial decisions could still constitute harassment – especially when considered in combination with other allegations regarding conduct outside the scope of a supervisor's responsibilities, such as asking the police go to Ngo's house to perform a welfare check even though they knew he was on medical leave and without attempting to reach his emergency contact before doing so, and referring to his son as "retarded."[4] Because there is a possibility that a state court would find that the complaint states a cause of action for harassment under FEHA against both Buksh and Pierce, the Court concludes that neither defendant was fraudulently joined.

---

[3] The Court notes that the harassment claim asserted against Pierce and Buksh in the FAC refers only to harassment based on physical disability, mental disability and medical condition. *See* FAC ¶¶ 99-103. Elsewhere in the FAC, however, Ngo alleges that his supervisors "had been determined to block Ngo's return to work and had a longstanding desire to fire him due to . . . his race, . . . ethnicity, [and] national origin." FAC ¶ 81. Ngo also alleges that he was treated less favorably with respect to workplace accommodations related to medical conditions than other employees who were not of East Asian heritage. FAC ¶¶ 31, 38. As the Court must consider not only the claims that have been alleged but also whether the complaint can be amended to assert claims that might survive in state court, the Court considers Ngo's allegations of harassment based on race, ethnicity and national origin in determining whether he has been fraudulently joined.

[4] Defendant Pierce has submitted a declaration denying that she made this statement. This declaration establishes nothing but that there is a dispute of fact as to Ngo's allegation. Under *Grancare* the existence of factual disputes as to a defendant's conduct is not sufficient to demonstrate that that defendant has been fraudulently joined.

11

## IV. CONCLUSION

For the reasons stated above, the Court GRANTS the Motion and orders that this case be REMANDED to the Superior Court for the County of Alameda.[5]

**IT IS SO ORDERED.**

Dated: November 15, 2019

_____
JOSEPH C. SPERO
Chief Magistrate Judge

---

[5] The Court notes that Ngo has not requested that the Court award attorneys' fees in connection with the remand. *See* Motion at 2 n. 2 (reserving the right to move for attorneys' fees after the Court decides the Motion); Reply at 14 ("Plaintiff did not move for fees and reserves the right to do so"). Therefore, the Court need not address whether Defendants' removal of this action to federal court was objectively unreasonable. Because the Court does not award fees incurred in connection with Defendants' removal in this Order, it is not appealable. *K.V. Mart Co. v. United Food & Commercial Workers Int'l Union, Local 324*, 173 F.3d 1221, 1223 (9th Cir. 1999) ("Although the remand order itself is not reviewable, *see* 28 U.S.C. § 1447(d), an award of attorneys' fees and costs for improper removal is reviewed for abuse of discretion.") (citation omitted).